# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## CENTRAL DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | Case No. 11-43424  -MSH |
| FORMATECH, INC. | ) | |
| | ) | |
| DEBTOR | ) | |
| | ) | |
| CELLCEUTIX CORPORATON | ) | |
| | ) | |
| Plaintiff | ) | Adversary Proceeding |
| v. | ) | No. 12-4041 |
| | ) | |
| DAVID M. NICKLESS, CHAPTER 7 TRUSTEE | ) | |
| | ) | |
| | ) | |
| Defendant | ) | |
| and | ) | |
| | ) | |
| SOVEREIGN BANK, N.A. | ) | |
| Intervenor/Defendant | ) | |
| | ) | |
| | ) | |
| SOVEREIGN BANK, N.A. | ) | |
| | ) | |
| Intervenor/Crossclaimant | ) | |
| v. | ) | |
| | ) | |
| DAVID M. NICKLESS, CHAPTER 7 TRUSTEE | ) | |
| | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

**MEMORANDUM OF DECISION ON DEFENDANT TRUSTEE'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT AS TO PLAINTIFF CELLCEUTIX CORPORATION AND MOTION FOR SUMMARY JUDGMENT OF SOVEREIGN BANK, N.A. AS TO PLAINTIFF CELLCEUTIX CORPORATION**

1

This adversary proceeding arises from a dispute between Cellceutix Corporation and David M. Nickless, the chapter 7 trustee of the estate of Formatech, Inc., over Cellceutix's claim of a right to rescind an agreement by which it transferred shares of its stock to Formatech. The chapter 7 trustee seeks dismissal of Cellceutix's three-count complaint or, alternately, summary judgment in his favor. Sovereign Bank, N.A., which has been allowed to intervene as a party defendant, asserts a security interest in the stock and seeks summary judgment declaring that regardless of whether the Formatech-Cellceutix agreement is rescinded its rights in the stock are superior to those of Cellceutix. Although the trustee and Sovereign Bank disagree as to which of them has superior rights in the stock, that issue is not now before me.

## Facts

The facts are taken from the affidavits and exhibits thereto filed in support of and in opposition to the motions for summary judgment and from the affidavit of William Jay Reese, III, vice president of Sovereign Bank, and exhibits thereto submitted in support of Sovereign Bank's motion to intervene.[1] Except as otherwise noted the material facts are not in dispute.

On March 17, 2010, Formatech and Cellceutix entered into a Clinical Materials Contract Aseptic Fill Manufacturing Agreement (the "Manufacturing Agreement")[2] pursuant to which Formatech was to provide various services, including manufacturing a drug developed by Cellceutix called Kevetrin for use in clinical trials. Formatech was to produce the drug in

---

[1]I may take judicial notice of pleadings on the docket. *See LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.),* 196 F.3d 1, 8 (1st Cir. 1999).

[2]A copy of the Manufacturing Agreement is attached as exhibit A to the Affidavit of David M. Nickless submitted in support of his motion to dismiss or for summary judgment and as exhibit A to the affidavit of Joseph Evans submitted in support of the opposition to the trustee's motion for summary judgment.

accordance with the Food and Drug Administration's ("FDA") "Current Good Manufacturing

Practices ("CGMP")[3] and the instructions contained in a Project Agreement and Letter of

Authorization dated March 17, 2010 (the "Project Agreement") between Formatech and

Cellceutix.[4] The Manufacturing Agreement stated that it is governed by Massachusetts law.

The Manufacturing Agreement exculpated Formatech from damages caused by

Formatech's delay or default in performing its obligations under the Manufacturing Agreement if

the delay or default was "caused by conditions beyond Formatech's control … [which] shall

include, but are not limited to, … regulation or law or other action of government or any agency

thereof…." Formatech was to promptly notify Cellceutix of any such events and make all

"reasonable efforts toward prompt resumption of its performance when possible…."[5]

---

[3] "[T]he term 'current good manufacturing practice' includes the implementation of oversight and controls over the manufacture of drugs to ensure quality, including managing the risk of and establishing the safety of raw materials, materials used in the manufacturing of drugs, and finished drug products." 21 U.S.C.A. § 351. *See also* 21 C.F.R. Parts 210 and 211. It is the mandatory standard of compliance set by the FDA for pharmaceutical manufacturing. *See* 21 U.S.C. § 351(a)(2)(B) and 21 C.F.R. Parts 210 and 211. "The regulations help guarantee that the drug in the bottle matches what is on the label." *In re Digitek Products Liability Litigation*, 821 F. Supp.2d 822, 826 n.3 (S.D.W. Va. 2011).

[4] According to the Manufacturing Agreement Cellceutix and Formatech were to execute a project agreement for each lot of Kevetrin that Formatech was to make. A lot refers to all vials of the drug that were produced in a single manufacturing run. Transcript of deposition of Jeffrey Bernard, Formatech's director of business development, attached as exhibit I to the Nickless affidavit and exhibit G to the Evans affidavit, at 24 (hereinafter "Bernard Tr. at __"). The copy of the Project Agreement, attached to the affidavit of Joseph Evans as exhibit B, is signed only by Formatech. None of the parties disputes its authenticity, the fact that it is one of the operative agreements between Cellceutix and Formatech, or that it is representative of other project agreements which Cellceutix and Formatech may have signed for each lot of Kevetrin Formatech was to produce.

[5] Manufacturing Agreement at XIII A.

3

Between August and November 2010, the FDA conducted an inspection of Formatech's manufacturing facility and generated on a form referred to as an "FDA 483" its findings from its inspection.[6] The FDA found violations of CGMP which required remediation by Formatech. In fact, even before the FDA inspection had been completed and although not yet mandated to do so by the FDA, Formatech ceased operations in its manufacturing area to begin remediation.[7] Consequently, Formatech's manufacturing operations ceased for a month or two in the fall of 2010.[8]  The temporary cessation of manufacturing and the stigma associated with the FDA's inspection and the FDA 483 caused Formatech's revenues to decline in 2010.[9]

Formatech also retained consultants, who were expert in the drug industry, to review the results of the FDA's inspection and assist Formatech in planning the remediation and its formal response to the FDA 483.[10] During this period Formatech's chief executive officer called the FDA almost weekly attempting to arrange a meeting to discuss Formatech's remediation.[11] The FDA rebuffed all of Formatech's requests for a meeting during this period.[12] Mr. Bernard testified that he did not know personally but believed that Cellceutix had been informed of the FDA's inspection and the ensuing cessation of manufacturing. He testified that since such

---

[6] Bernard Tr. at pp. 12, 29-32.

[7] *Id.* at pp. 59-60.

[8] *Id.* at 60.

[9] *Id.* at pp. 63-64.

[10] *Id.*  at pp. 69, 75-77.

[11] *Id.* at 70.

[12] *Id.*

4

notification was handled by Formatech's quality assurance group, he was not personally aware of when or which clients received notice.[13] He testified that he believed that Cellceutix was informed of the remediation because "that was our standard practice."[14]

Formatech believed it had remediated the conditions identified in the FDA 483 and by letter dated November 8, 2010, Michael Healey, Formatech's director of quality assurance, provided Cellceutix with a copy of Formatech's redacted response to the FDA 483.[15] On or about November 19, 2010, Mr. Healy informed Cellceutix by email that Formatech had completed its remediation and would re-start operations the next day.[16]

On or about February 10, 2011, the FDA sent Formatech a warning letter notifying Formatech that the FDA had identified deficiencies in Formatech's manufacturing facility and breaches of the FDA's CGMP.[17] After receiving the warning letter, Formatech went back to its consultants in an attempt to understand what concerns the FDA still had since Formatech believed that it had responded satisfactorily to the FDA 483.[18] At this point the FDA granted Formatech's request for a meeting which occurred in approximately March 2011 and during

---

[13] *Id.* at 28.

[14] *Id.* at pp. 65-66.

[15] A copy of the letter is attached as exhibit C to the Evans affidavit. The letter identifies the FDA's form as "483" while at various places in Mr. Bernard's deposition, the form is referred to as "FDA 43." According to the FDA's website, its investigational findings that conditions may violate the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, are listed on form 483. *See* http://www.fda.gov/ICECI/EnforcementActions/ucm256377.htm (last visited June 12, 2013).

[16] Affidavit of Krishna Menon, president of Celleutix.

[17] Exhibit B to the Nickless affidavit and exhibit E to the Evans affidavit.

[18] Bernard Tr. at 69.

which the FDA informed Formatech that its responses to the FDA 483 had been "too specific" and that the FDA was looking for a more "global response."[19]

After its receipt of the FDA's warning letter, Formatech hired former FDA inspectors as consultants to review and "tighten up" Formatech's corrective actions. After the review, the consultants informed Formatech that they believed the company was "in very good shape" and in compliance with CGMP.[20]

There is some disagreement as to whether and when Formatech may have told Cellceutix about the FDA's warning letter. Mr. Bernard testified:

> We would have notified any client that had previously manufactured in-within[sic] a reasonable time frame—probably going back to the date of the first inspection, but I'm not sure—and anyone who was on the calendar to manufacture, moving forward, to notify them that a warning letter had been received. And we invited all of those clients to have the opportunity to review our 43 [sic] responses, our Warning Letter responses, our planned responses, and also invite them to come in to do their own quality assurance audit to ensure that they were comfortable with our systems, procedures, et cetera, before moving forward.[21]

He also noted that the FDA's warning letter was a public document and was posted on the FDA website.[22]

On March 1, 2011, Formatech and Cellceutix entered into an Alternative Payment Structure Agreement (the "APS Agreement")[23] pursuant to which Formatech received cash and 184,375 shares of unregistered Cellceutix stock, evidenced by a stock certificate dated May 27,

---

[19] *Id.* at pp. 70-71.

[20] *Id.*

[21] *Id.* at pp. 72-73.

[22] *Id.* at pp. 72-80 and 88-89.

[23] Exhibit C to the Nickless affidavit and exhibit F to the Evans affidavit.

2011, in payment for certain of the services Formatech rendered or was to render to Cellceutix under the Manufacturing and Project Agreements.[24] The APS Agreement provides that it is governed by Massachusetts law.

Krishna Menon, Cellceutix's president, testified in her affidavit that Cellceutix had no notice of the warning letter until sometime after the APS Agreement was executed.[25] Ms. Menon testified that had she known about the warning letter Cellceutix would not have entered into the APS Agreement but would have terminated its agreements with Formatech.[26]

In March 2011, Formatech finally began manufacturing Kevetrin although Formatech did not ship the finished product to Cellceutix's designee until August 2011.[27] By this time circumstances had changed for the worse at Formatech.

On August 12, 2011, Formatech filed a voluntary petition under chapter 11 of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*). On August 14, 2011, by email to Sylvia Holden at Cellceutix, with a copy to Ms. Menon, Mr. Bernard informed Cellceutix of the status of the FDA investigation and of Formatech's filing for bankruptcy protection.[28] In part the email stated:

---

[24] Exhibit E to Nickless affidavit and exhibit B to affidavit of Joseph Evans submitted in support of Cellceutix's opposition to Sovereign's motion for summary judgment.

[25] Menon affidavit at ¶ 13.

[26] *Id.* at ¶ 14.

[27] Complaint at ¶ 17. Although the trustee denied this allegation in his answer to the complaint, he incorporated it into his statement of uncontested facts but noted at oral argument that the delay in shipping the drug was at Cellceutix's request. It is unclear whether completed lots of Kevetrin were delivered to Cellceutix's designee or if raw materials, or both, were sent. This difference is not relevant at this stage of the proceeding.

[28] Exhibit J to the Nickless affidavit.

As you know, the FDA has been at our facility performing re-inspection for the last 3 weeks. We learned on Thursday that they plan to continue the inspection into next week and that observations will be issued on a Form 483. The inspectors, as of Friday afternoon, had not yet completed their review of our Warning Letter responses. The effect of the yet to be closed Warning Letter combined with the threat of FDA actions that could affect our client's ability to continue or file for new trials wit [sic] drug product manufactured at our facility, has forced many of our clients to find alternative CMO's to address their near-term requirements for clinical supplies pending resolution of the inspections.

On Friday, August 12 at 3:00 pm, our owners called a company meeting to announce that we do not have the resources to ride out another round of 483 responses, corrective actions, etc. A rather painful decision was made—Formatech filed for bankruptcy and we are discontinuing all operations….

This weekend, I performed a review of our inventory and the urgent requirement of this e-mail is to provide you with a list of your materials that (I believe) are currently onsite. Our goal is to either return or destroy all inventory by Friday, August 19. A skeleton crew will remain onsite this week to assist in packing and shipping these materials.

On November 7, 2011 Celleceutix submitted its investigational new drug application ("IND") for Kevetrin to the FDA.[29] The IND named Formatech as the manufacturer of the Kevetrin that was to be used in the clinical trials.[30] On or about December 5, 2011, the FDA notified Cellceutix verbally and then on December 15, 2011, by letter, that it had placed a "full clinical hold" on Kevetrin.[31] In its letter of December 15, 2011, the FDA informed Cellceutix that:

Formatech, Inc., located in Andover, MA is a contract manufacturer for the Kevetrin investigational product under your IND. An FDA inspection of the Formatech clinical supply manufacturing facility resulted in the issuance of a Warning Letter enforcement action on February 10, 2011, (see letter publically available on the FDA website at http://www/fda/gov/ICECI/ EnforcementActions/WarningLetters/ucm248216.htm) that identified significant violations of Current Good Manufacturing Practice (CGMP) regulations at their clinical supply manufacturing facility. Therefore, we believe that

---

[29] Menon affidavit at ¶ 15.

[30] *Id.*

[31] *Id.*

Kevetrin drug product lot(s) manufactured by Formatech were not manufactured under CGMP conditions….

In order to address this issue, please provide a statement that lot(s) of the investigational drug manufactured at Formatech, Inc., located in Andover, MA, will not be used for clinical testing.[32]

Between 2005 and February 2011, Formatech borrowed funds from Sovereign Bank and in return granted Sovereign Bank a security interest in all of Formatech's assets. Cellceutix does not dispute that among Sovereign Bank's collateral is "investment property," namely its stock certificates, nor does it dispute that Soveriegn Bank properly filed forms UCC-1 and UCC-3 regarding its collateral.[33] Sovereign Bank filed a proof of claim asserting a secured claim against the bankruptcy estate in the amount of $1,108,992.04 as of the bankruptcy petition date. After applying payments received from the post-petition sale of other collateral Sovereign Bank now holds a secured claim of approximately $140,000.

## Procedural Posture

On February 2, 2012, Formatech's chapter 11 case was converted to chapter 7 and David M. Nickless was appointed the chapter 7 trustee. On March 30, 2012, the trustee filed a motion for authority to sell the Cellceutix stock. Sovereign Bank objected to the sale motion to protect its secured claim as the sale was to be free and clear of its asserted lien. On April 23, 2012,

---

[32] Evans affidavit at exhibit H.

[33] Although the security agreement dated June 29, 2005 attached to Sovereign Bank's proof of claim filed in the main case grants the bank a security interest in "all inventory, chattel, paper, accounts, equipment, and general intangibles," the security agreement dated May 6, 2008 attached to Mr. Reese's affidavit granted Sovereign a security in, among other things, "investment property." The only UCC- 1 financing statement which is in the record was filed with the Massachusetts Secretary of State on September 19, 2003, and continued by a UCC-3 continuation statement filed June 4, 2008. It includes investment property among the identified collateral.

Cellceutix commenced this adversary proceeding against the trustee by filing a three-count

complaint seeking damages and rescission of the APS Agreement based upon breach of contract,

presumably of the Manufacturing Agreement (count I), violations of MASS. GEN. LAWS ch. 93A

(count II) and fraud and misrepresentation in connection with the APS Agreement (count III). On

the same day Cellceutix also filed in the main case both a proof of claim asserting a claim in the

amount of $337,000 based on the counts asserted in the adversary proceeding and an objection to

the trustee's sale motion on the grounds that the shares were not property of the estate. After

holding a hearing on the trustee's sale motion, I entered the following order:

> Cellceutix Corp. shall post a bond with the court in the amount of $185,000 by July 31, 2012
> to indemnify the estate against any loss in the value of the Cellceutix stock in the event
> Cellceutix is not the prevailing party in adversary proceeding #12-4041. If the bond is posted,
> the trustee's motion to sell will be continued generally pending judgment in the adversary
> proceeding or further order of the court. If the bond is not posted, the trustee's motion will be
> granted subject to the sale proceeds being held by the trustee in escrow pending judgment in
> the adv[ersary] proceeding or further order.

Cellceutix did not post a bond and the trustee sold the Cellceutix shares and is holding the sale

proceeds in escrow in order to preserve Sovereign Bank's and/or Cellceutix's rights to the

money.

Sovereign Bank has been permitted to intervene in this adversary proceeding by virtue of

its claimed security interest in the Celleceutix stock and now, after the sale, to the proceeds

therefrom.

## The Trustee's Motion to Dismiss or For Summary Judgment[34]

**The Trustee's Request For Dismissal**

In seeking dismissal of the complaint the trustee asserts that Cellceutix's filing of the adversary proceeding was a violation of the automatic stay provisions of Bankruptcy Code § 362, that the complaint should be dismissed so that Cellceutix's rights may be determined in the claims allowance process or at the very least that Cellceutix's rescission claims should be dismissed.

Courts disagree as to whether the filing of an adversary proceeding in the debtor's "home court," that is, the court in which the debtor's bankruptcy case is pending, is a violation of the automatic stay. *Compare Prewitt v. North Coast Village, Ltd. (In re North Coast Village, Ltd.)*, 135 B.R. 641, 643 (9th Cir. B.A.P. 1992) and *Kesar v. Uni-Marts, LLC (In re Uni-Marts, LLC*, 405 B.R. 113, 129 (Bankr. D. Del. 2009) ("The Court agrees with the reasoning of the majority of courts addressing the issue that the filing of an adversary complaint against a debtor in the home bankruptcy court is equivalent to filing a proof of claim in the debtor's bankruptcy case and therefore does not violate the automatic stay.") (collecting cases) *with Bridges v. Continentalafa Dispensing Co. (In re Continentalafa Dispensing Co.)*, 403 B.R. 653, 659 (Bankr. E.D. Mo. 2009) ("Since Plaintiff's claims stem from pre-petition debts, Plaintiff's Complaint to collect on this pre-petition debt would in fact violate the automatic stay."). I agree with the majority view that the automatic stay does not prohibit the commencement of an adversary proceeding against a debtor (or its trustee) in the bankruptcy court where the debtor's bankruptcy case is pending. Extending the automatic stay to apply to adversary proceedings filed

---

[34] Although the trustee frames his argument in the alternative, he cites the legal stand for determining a motion for summary judgment.

in a debtor's home court would not advance the primary purposes of the stay— affording a debtor breathing room, preserving the status quo by preventing a race to grab assets, and providing the orderly administration and liquidation of the estate. *Id.*

Contrary to the trustee's suggestion, the fact that Cellceutix has filed a proof of claim does not divest it of the right to file an adversary proceeding. *See generally Bruno v. Mona Lisa at Celebration, LLC (In re Mona Lisa at Celebration, LLC)*, 410 B.R. 710, 716 (Bankr. M.D. Fla. 2009). With certain exceptions not relevant here, Fed. R. Bankr. P. 7001(1) includes among the list of adversary proceedings "a proceeding to recover money or property." Moreover, the trustee's request to dismiss the complaint to the extent it seeks rescission of the APS Agreement[35] is really a request for a declaratory judgment that Cellceutix does not hold an interest in the stock and not entitled to rescission of the APS Agreement. Such claims must also be asserted in an adversary proceeding. Fed. R. Bankr. P. 7001(2) and (9). In fact, Fed. R. Bankr. P. 3007(b) prohibits the trustee from asserting a claim for declaratory judgment as part of an objection to claim and requires that it be included in an adversary proceeding.

If the complaint is not dismissed in its entirety, the trustee seeks at least dismissal of Cellceutix's rescission demands.[36] Although the trustee does not say so I must assume that he is

---

[35] The trustee interprets the complaint as one solely for rescission and alleges that, in this adversary proceeding, Cellceutix has not asserted that it is entitled to return of the cash it paid Formatech under the Alternative Payment Agreement. He is mistaken. The prayer for relief for each count requests "judgment against Formatech, as provided by law, for all damages plus costs, interest and attorney's fees.  In addition, Cellceutix requests that the Court order the return of the Cellceutix stock certificates that were tendered to Formatech for work that Formatech failed to perform." The prayer for relief in count II also requests punitive damages.

[36] As the stock has been sold, Cellceutix's remedy at this point would be recovery of the escrowed proceeds generated by the sale.

12

seeking dismissal of Cellceutix's rescission demand pursuant to Fed. R. Civ. P. 12(b)(6), made

applicable to this proceeding by Fed. R. Bankr. P. 701. Under this rule:

> The court may dismiss a complaint for "failure to state a claim upon which relief can be
> granted." Fed.R.Civ.P. 12(b)(6), made applicable to this proceeding by Fed. R. Bankr.P.
> 7012. In deciding a motion to dismiss "a court must take the allegations in the complaint
> as true and must make all reasonable inferences in favor of the plaintiffs." *Watterson v.
> Page,* 987 F.2d 1, 3 (1st Cir.1993). To avoid dismissal of a claim under Rule 12(b)(6), a
> plaintiff must plead "factual content that allows the court to draw the reasonable
> inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556
> U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v.
> Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). It is not enough
> to speculate as to the facts or simply allege the elements of a claim. *Id.* A court is "not
> bound to accept legal conclusions couched in fact." *In re Di Vittorio,* 430 B.R. 26, 44
> (Bankr. D. Mass.2010). Nor should a court give credence to any "fact" which has been
> "conclusively contradicted by plaintiffs' concessions or otherwise." *Chongris v. Bd. of
> Appeals of Town of Andover,* 811 F.2d 36, 37 (1st Cir. 1987).

*Silveira v. Wells Fargo Bank, N.A. (In re Silveira)*, 12-4036, 2013 WL 1867472, 5 (Bankr. D.

Mass. May 3, 2013).

Rescission is an equitable remedy that is available when a contract has been entered into

through "fraud, accident, mistake or some type of grossly inequitable conduct which renders the

contract void ab initio." '*P.L.A.Y., Inc. v. NIKE, Inc.,* 1 F. Supp.2d 60, 65 (D. Mass. 1998)

(applying Massachusetts law).[37] "There is ample authority for refusing rescission where there has

been only a breach of contract rather than an utter failure of consideration or a repudiation by the

party in breach. In the absence of fraud, nothing less than conduct that amounts to an abrogation

of the contract, or that goes to the essence of it, or takes away its foundation, can be made a

ground for rescission of it by the other party." *Worcester Heritage Soc., Inc. v. Trussell*, 31

Mass. App. Ct. 343, 345, 577 N.E.2d 1009, 1010 (1991) (internal citation and quotation marks

omitted). "The object of rescission is to arrive so far as possible at full restoration of the status

---

[37] The APS Agreement and the Manufacturing Agreement are governed by Massachusetts law.

13

quo before the transaction which is being cancelled." *Farnum v. Silvano*,  27 Mass. App. Ct. 536, 541, 540 N.E.2d 202, 205 (1989) (internal citations omitted). "A claimant is entitled to restitution from property may obtain restitution from any traceable product of that property, without regard to its subsequent changes of form." Restatement (Third) of the Restitution and Unjust Enrichment (2011) § 58(1). The party seeking rescission bears the burden of pleading factual circumstances which merit such relief. *Coggins v. New England Patriots Football Club, Inc.,* 397 Mass. 525, 492 N.E.2d 1112, 1119–20 (1986).

Cellceutix argues that it is entitled to the return of its stock because Formatech entered into the APS Agreement knowing that it could not perform as it was in breach of the FDA's CGMP. As a result, Cellceutix claims that the stock reverts to it and that the trustee, standing in Formatech's shoes, has no greater rights than Formatech had prepetition. In other words, in Cellceutix's view the trustee is required to give back the stock, or now, the escrowed proceeds from the sale of the stock.

Under Massachusetts law a transferee of property under a contract subject to a right of rescission holds *voidable* title to the property. Title becomes void only upon a judgment of rescission. *White v. Dodge*, 187 Mass. 449, 450, 73 N.E. 549, 550 (Mass. 1905) ("The plaintiff's principal claim rests upon the alleged fraud of Dodge in obtaining the execution and delivery to him of these contracts. If he was guilty of fraud, as she alleges, the title which he obtained was voidable by her; but it was sufficient for him to give a perfect title to a bona fide purchaser for value, before she took measures to avoid it.").

Prior to the commencement of this adversary proceeding Cellceutix took no action to rescind the APS Agreement and thus when Formatech filed its bankruptcy petition (and, as

14

discussed below, when it granted Sovereign a security interest in the stock), it held voidable title

to the stock to which title the trustee succeeded. But the fact the Formatech and now the trustee

held voidable title does not address what interest, if any, Cellceutix held in the stock on the

bankruptcy petition date.

Cellceutix does not articulate what its interest was as of the petition date. The trustee

asserts that it had none. Moreover, the trustee argues that whatever interest Celleceutix had in the

stock on the petition date is irrelevant because under § 544(a)(1) or (2) of the Bankruptcy Code[38]

the trustee is armed with the powers of a lien or judgment creditor under state law without regard

to whether such creditor actually exists. *Abboud v. The Ground Round, Inc.,* 482 F.3d 15, 20 (1st

Cir. 2007). The trustee argues that under Massachusetts law a judicial lien creditor has the status

of a bona fide purchaser for value and a bona fide purchaser for value without knowledge may

defeat the claim of a rescinding transferor. *Rowley v. Bigelow*, 29 Mass. 307, 312, 1832 WL

---

[38] Bankruptcy Code § 544(a) provides in part:

> The trustee shall have, as of the commencement of the case, and without regard to any
> knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any
> transfer of property of the debtor or any obligation incurred by the debtor that is voidable
> by--

> (1) a creditor that extends credit to the debtor at the time of the commencement of the
> case, and that obtains, at such time and with respect to such credit, a judicial lien on all
> property on which a creditor on a simple contract could have obtained such a judicial
> lien, whether or not such a creditor exists;

> (2) a creditor that extends credit to the debtor at the time of the commencement of the
> case, and obtains, at such time and with respect to such credit, an execution against the
> debtor that is returned unsatisfied at such time, whether or not such a creditor exists….

15

2474, *1 (Mass. 1832) ("A fraudulent purchase of goods, accompanied with delivery, is not void but voidable only, at the election of the vendor, and until it is avoided the vendee has power to make a valid sale of the goods to a *bonâ fide* purchaser having no notice of the fraud.").

In Massachusetts, with respect to land, judicial lien creditors have the status of bona fide purchasers for value. *Woodward v. Sartwell*, 129 Mass. 210, 212 (1880). A judicial lien creditor, even one holding a judgment and an execution returned unsatisfied, is not accorded such status, however, when personal property rather than land is involved. The cases cited by the trustee that Massachusetts treats judicial lien creditors as bona fide purchasers for value without notice do not advance his cause. Both *In re Mill Concepts Corp.*, 123 B.R. 938 (Bankr. D. Mass. 1991), and *Tomsic v. Beaulac (In re Beaulac)*, 298 B.R. 31 (Bankr. D. Mass. 2003), cited by the trustee, involved real estate.

In *CRS Steam, Inc. v. Engineering Resources, Inc. (In re CRS Steam, Inc.),* 225 B.R. 833, 838 (Bankr. D. Mass. 1998), Judge Queenan highlighted the elevated status of bona fide purchasers:

> Under general state law, the beneficiary of a constructive trust has priority over creditors of the constructive trustee holding judicial liens. If the estate representative asserts only judicial lien rights, as he must under section 544(a) if personal property is involved, the estate fares no better than do judicial lien creditors outside of bankruptcy. But state law is kinder to a bona fide purchaser for value. That party enjoys priority over the beneficiary of a constructive trust.

The Restatement (Third) of Restitution and Unjust Enrichment (2011) § 60(1)[39] provides:

> Except as otherwise provided by statute and by § 61, a right to restitution from identifiable property is superior to the competing rights of a creditor of the recipient who

---

[39] Massachusetts courts look to the Restatement of Restitution for guidance when there is no Massachusetts controlling precedent on point. *Cox v. Cox*, 56 Mass. App. Ct. 864, 780 N.E.2d 951, 957 (2002).

is not a bona fide purchaser or payee of the property in question. Acquisition of a judicial lien (by attachment, garnishment, judgment, execution, or the like) does not make the lien creditor a purchaser of the property subject to lien.

Moreover, the trustee has not addressed the impact of Mass. Gen. Laws ch. 223 § 71 which prohibits the attachment of stock in a civil action in which only money damages are sought. While claims to stock can be asserted in an equitable action to reach and apply, MASS. GEN. LAWS ch. 214, § 3(7), an action to reach and apply does not in and of itself create a lien on the stock. To create a lien, a non-judgment creditor must obtain an injunction against a debtor's disposing of the stock. *In re Fraden,* 317 B.R. 24, 37 n.30 (Bankr. D. Mass. 2004); *Rioux v. Cronin,* 222 Mass. 131, 109 N.E. 898 (1915).

Cellceutix has asserted no claim that it holds or is seeking an equitable lien in the stock. *In re Linehan*, 341 B.R. 110, 118 (Bankr. D. Mass. 2006) (citing *Gray v. FDIC (In re Ryan)*, 93-17922, 1993 WL 442737, at *7 (Bankr. D. Mass. Feb. 20, 1993) (party asserting equitable lien has the burden of proving its existence). Nor has either party addressed when under Massachusetts law a constructive trust, a type of equitable lien,[40] arises. I decline to wade into such murky waters.[41] On the record before me I cannot say that a claim for rescission, a

---

[40] *Mill Concepts*, 123 B.R. at 944.

[41] In *CRS Steam* Judge Queenan recognized the conflict among courts and commentators over this issue.

> There is disagreement on the nature of the claimant's rights in the property prior to its transfer to him. Although conceding that a constructive trust is merely a remedy and thus quite different from a true trust, the *Restatement* nevertheless observes that the constructive trust claimant has "some kind of an equitable interest in the property." Scott agrees. He believes the trust exists from the time the "trustee" acquires the property. He likens the equitable property rights of the claimant to those of a purchaser under a contract which is specifically enforceable. Recognizing that the question is "difficult," Scott believes the existence of such an interest is supported by the priority which the

prerequisite to Cellceutix's arguing it holds more than a simple unsecured claim, is not plausible although I hasten to add that Cellceutix bears a heavy burden and will have to show considerably more than a mere breach of contract to support its claim. Consequently, the trustee's motion to dismiss the complaint on the basis that Cellceutix is not entitled to the remedy of rescission under any of the counts must be denied.

**The Trustee's Request for Summary Judgment**

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) made applicable by Fed. R. Bankr. P. 7056. As noted above, Cellceutix seeks damages as well as rescission.

Summary judgment cannot be granted on Cellceutix's claim for damages in count I of the complaint, the breach of contract claim, since there is a genuine dispute of material facts. The trustee claims that Cellceutix had appropriate notice of the FDA's various actions and that there is no evidence that Formatech misrepresented any material fact to Cellceutix. What and when, if anything, Formatech communicated to Cellceutix, however, is disputed thus raising the possibility that Formatech did not comply with its obligation to provide notice as called for under the Manufacturing Agreement.

---

beneficiary enjoys over intervening judicial creditors and transferees who are not bona fide purchasers for value. Bogert has a different view as to when the trust arises. Stressing the fictional nature of the trust and the beneficiary's right to elect to receive either the property or its value, he thinks no trust arises until entry of a decree ordering the transfer. He expresses no opinion on whether the beneficiary has a property interest thereafter. Under Illinois law, which governs the employment agreement here, no trust exists until entry of the decree. Many other courts apply the fiction to its full extent and rule that the trust exists from the time of the property's acquisition by the "trustee." (Footnotes omitted).

With respect to count II in which Cellceutix seeks damages under MASS. GEN. LAWS ch. 93A, the trustee argues that what Formatech did or did not do prior to the execution of the APS Agreement was not so outrageous as to warrant the finding of a violation of chapter 93A which, the trustee says, requires oppressive conduct.  He argues that if there was a failure to inform Cellceutix, that behavior is nothing more than negligence.

Chapter 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2.  "[A]n act or practice is a violation of chapter 93A, section 2 if: (1) [i]t is oppressive or otherwise unconscionable in any respect; or [a]ny person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction...." 940 C.M.R § 3.16. "An act may be 'deceptive' [under c. 93A,] § 2(a) if it 'could reasonably be found to have caused a person to act differently from the way he otherwise would have acted.'" *Mongeau v. Boutelle,* 10 Mass. App. Ct. 246, 248, 407 N.E.2d 352 (1980), quoting from *Purity Supreme, Inc. v. Attorney Gen.,* 380 Mass. 762, 777, 407 N.E.2d 297 (1980). "A ruling on what conduct violates Massachusetts' consumer protection statute, Chapter 93A, is a legal determination….However, the question of whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact." *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 582 F.3d 156, 184 (1st Cir. 2009) (internal citation and quotation marks omitted).

But as noted, the parties dispute what Cellceutix knew about the warning letter prior to entering into the APS Agreement, including whether Formatech had notified Cellceutix of the letter. By Mr. Bernard's own admission, Formatech lost some business beginning with the FDA

19

investigation. Some of the lost business was not recaptured by Formatech. Moreover, by his own testimony, Mr. Bernard could not say with any degree of certainty that Formatech gave Cellceutix timely notices of the status of FDA's various actions and the testimony of Michael Healey, who presumably would have such information, is not part of the record before me. Consequently, the trustee's motion for summary judgment must be denied as to count II.

In count III Cellceutix seeks damages arising from Formatech's fraud and misrepresentation. Under Massachusetts law a claim for misrepresentation requires that a plaintiff show a false statement of material fact made to induce the plaintiff to act and that the plaintiff reasonably or justifiably relied on the false statement to his detriment. *Zimmerman v. Kent,* 31 Mass. App. Ct. 72, 77, 575 N.E.2d 70 (1991). [42] On the record before me, I cannot say whether Formatech failed to disclose the existence of the FDA's warning letter to Cellceutix and if the disclosure was not made whether the non-disclosure was done to induce Cellceutix to enter into the APS Agreement. Nor can I determine on the record before me whether Cellceutix's reliance was reasonable or justified if it already knew there was a problem. That coupled with the disputed facts noted above prevents the entry of summary judgment on count III.

### Sovereign Bank's Motion for Summary Judgment

Sovereign Bank seeks summary judgment that its interest in the stock, or now the proceeds from the sale of the stock, is superior to Cellceutix's interest even if Cellceutix

---

[42] In *Masingill v. EMC Corp.*, 449 Mass. 532, 540-541, 870 N.E.2d 81, 88 (Mass. 2007), the court stated *reasonable* reliance is needed to prove fraudulent misrepresentation. The court's citation to *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.,* 438 Mass. 459, 467, 781 N.E.2d 787 (2003), which discussed when reliance *justified* in the context of fraudulent misrepresentation, has caused courts to conclude that the terms are used interchangeably in Massachusetts. *In re Access Cardiosystems, Inc.*, 404 B.R. 593, 649 n.82 (Bankr. D. Mass. 2009).

succeeds on its rescission claims against the trustee. Cellceutix challenges Sovereign Bank's

claim for two reasons First, it asserts that Sovereign Bank was not a holder in due course of the

stock certificate and second, Cellceutix argues that even if Sovereign Bank had a valid security

interest in the stock, Sovereign must look to other collateral for payment of its remaining claim

before it can look to the stock certificates. As to its first argument Sovereign Bank is not alleging

holder in due course status. That term applies to one who holds an "instrument." MASS. GEN.

LAWS ch. 106, § 3-302. Stock is not an instrument, MASS. GEN. LAWS ch. 106, § 3-104(b); it is

investment property. MASS. GEN. LAWS ch. 106, § 9-102(49) ("'Investment property'" means a

security, whether certificated or uncertificated, security entitlement, securities account,

commodity contract, or commodity account.").

As to its second argument"[m]arshaling is an equitable doctrine that may be invoked

when a senior and a junior creditor are both secured by a common asset, but where the senior

creditor is also secured by some other asset, or assets, of a common debtor." *Sunset Hollow*

*Properties, LLC v. The Bank of Western Massachusetts (In re Sunset Hollow Properties, LLC)*,

359 B.R. 366, 378 -79 (Bank. D. Mass. 2007). Before it applies both creditors must hold secured

claims and the assets must be those of a common debtor. *Argus Management Corp. v. First*

*National bank of Boston (In re Mid Cape Grain, Inc.),* 185 B.R. 403, 404 (Bankr. D. Mass.

1995). Cellceutix, based on the record before me, has not satisfied those requirements. Therefore

the doctrine of marshaling affords Cellceutix no relief against Sovereign's security interest.

Simply stated, Sovereign Bank as a holder of a voluntarily given security interest is the

equivalent of a bona fide purchaser for value. MASS. GEN. LAWS ch. 106, § 1-201(33)

("purchaser" is "a person or his nominee who takes by purchase"); MASS. GEN. LAWS ch. 106, §

1-201(32) ("Purchase includes taking by sale, discount, negotiation, mortgage, pledge lien, or re-issue, gift *or any other voluntary transaction* creating an interest in property.") (emphasis added) and MASS. GEN. LAWS ch. 106, § 1-201(44) ("value" includes (a) "… a binding commitment to extend credit or … the extension of immediately available credit;" as well as "(d) … any consideration sufficient to support a simple contract").[43] As such Sovereign Bank's claim is superior to that of Cellceutix even if Cellceutix were to prevail against the trustee. Restatement (Third) of Restitution, § 66.[44] Sovereign Bank is therefore entitled to summary judgment.

## Conclusions

For the reasons set forth above, the trustee's motion to dismiss or for summary judgment will be denied. Sovereign Bank's motion for summary judgment will be allowed.

Separate orders will issue.


Dated: July 9, 2013                                          By the Court,


                                                             Melvin S. Hoffman
                                                             U.S. Bankruptcy Judge

---

[43] The trustee, because he has only the status of a lien or judgment creditor with respect to personal property, is not a bona fide purchaser for value. *Shawmut Bank of Boston v. Vera,* 352 Mass. 11, 14-15 (1967) (person who purchases property by means of an involuntary sale is not a purchaser).

[44] Section 66 of the Restatement provides:

> A purchaser for value and without notice acquires the legal interest that the grantor holds and purports to convey, free of equitable interests that a restitution claimant might have asserted against the property in the hands of the grantor.

Counsel appearing:

Joseph P. Evans, Esq.
Curley & Curley, P.C.
Boston, MA
For the plaintiff, Cellceutix Corporation


David M. Nickless, Esq.
Nickless, Phillips and O'Connor
Fitchburg MA
For defendant, David M. Nickless, Chapter 7 trustee of the estate of Formatech, Inc.


Bertin C. Emmons, Esq.
Salem, NH
For the intervenor, Sovereign Bank, N.A.